## OXYGENATED FUELS ASSOCIATION, INC. Plaintiff,

v.

**George PATAKI, in his capacity as Governor of the State of New York, and Eliot Spitzer, in his capacity as Attorney General for the State of New York, Defendants.**

No. 1:00–CV–1073.

United States District Court, N.D. New York.

May 18, 2001.

Frederick R. Anderson, Geraldine E. Edens, Stephen Chippendale, Mary Ran-dolph Sargent, Cadwalader, Wickersham & Taft, Washington, DC, for Plaintiff.

Carter H. Strickland, Jr., Assistant Attorney General, State of New York, Office of the Attorney General, Environmental Protection Bureau, New York City, for Defendants.

## MEMORANDUM–DECISION AND ORDER

MORDUE, District Judge.

### INTRODUCTION

Plaintiff moves for summary judgment under Fed.R.Civ.P. 56 in this action under the Supremacy Clause, U.S. CONST., Art. VI, cl. 2, the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, and the Civil Rights Act, 42 U.S.C. § 1983. The relief sought is authorized by 28 U.S.C. §§ 2201, 2202 and 42 U.S.C. § 1988(b). District Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983.

### BACKGROUND

**Complaint**

Plaintiff is a trade association, the members of which include major producers of methyl tertiary-butyl ether ("MTBE"), an oxygenated fuel additive ("oxygenate") used in motor vehicle fuel to improve combustion for the purpose of reducing emissions pollution. Plaintiff challenges the constitutionality of a New York law ("N.Y. MTBE Law") which bans the use, sale, or importation in New York of fuels containing MTBE as of January 1, 2004.

In its complaint, plaintiff claims that N.Y. MTBE Law violates the Supremacy Clause, because it legislates in a field preempted by Congress and the Administrator of the Environmental Protection Agency ("EPA"), and that it effects a violation of plaintiff's civil rights under 42 U.S.C. § 1983. Plaintiff seeks judgment

declaring that N.Y. MTBE Law is invalid because, in the Clean Air Act, 42 U.S.C. § 7401 *et seq.* ("CAA") and the regulations promulgated thereunder, Congress and EPA expressly preempted legislation in the field of fuel and fuel additives for whatever purpose; because Congress intended to occupy that field; and because N.Y. MTBE Law will be an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Plaintiff further seeks injunctive relief prohibiting New York from taking any further steps to implement or enforce N.Y. MTBE Law and from taking any future action to ban the use of MTBE in gasoline in New York. Plaintiff requests an award of attorney's fees.

**RFG program**

The stated purpose of CAA is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." CAA § 101(b)(1), 42 U.S.C. § 7401(b)(1). In furtherance of this purpose, Congress enacted the reformulated gasoline ("RFG") program in 1990, CAA § 211(k), 42 U.S.C. § 7545(k), to address ozone pollution in certain areas which have failed to attain National Ambient Air Quality Standards for ground-level ozone ("nonattainment" areas). The RFG program requires the sale in nonattainment areas of RFG, *i.e.*, gasoline to which oxygenates such as MTBE or ethanol are added for the pur-

pose of reducing ozone-causing emissions. CAA § 211(k)(5).

The RFG legislation directs EPA to "promulgate regulations . . . establishing requirements for reformulated gasoline to be used in gasoline-fueled vehicles" in nonattainment areas, CAA § 211(k)(1), and sets forth detailed requirements that EPA must include in its regulations. CAA § 211(k)(2), (3). The statute empowers EPA to determine which fuels may be sold in nonattainment areas and prohibits the sale or dispensing of all other fuels in those areas. CAA § 211(k)(4), (5). EPA may prescribe sampling, testing and record-keeping requirements and impose penalties, CAA § 211(d), (k)(5), and may adjust or waive requirements of the program under certain circumstances. CAA § (k)(2)(A), (B), (D). Section 211(c)(1) authorizes EPA to control or prohibit the sale of any fuel or fuel additive if in its judgment any emission product of that fuel or fuel additive causes or contributes to air pollution which may endanger public health or welfare. State regulation of any component or characteristic of a fuel or fuel additive for purposes of emissions control is proscribed except with EPA approval under narrowly defined circumstances. CAA § 211(c)(4)(A)(i), (ii).[1]

**N.Y. MTBE Law**

It is undisputed that MTBE has a greater affinity for water than other oxygenates, that it has been detected in groundwater in New York state, and that its taste

---

1. CAA § 211(c)(4)(A) provides:
 Except as otherwise provided . . . , no State (or political subdivision thereof) may prescribe or attempt to enforce, **for purposes of motor vehicle emission control**, any control or prohibition respecting any characteristic or component of a fuel or fuel additive in a motor vehicle or motor vehicle engine—
 (i) if the Administrator has found that no control or prohibition of the characteris-
 tic or component of a fuel or fuel additive under paragraph (1) is necessary and has published his finding in the Federal Register, or
 (ii) if the Administrator has prescribed under paragraph (1) a control or prohibition applicable to such characteristic or component of a fuel or fuel additive, unless State prohibition or control is identical to the prohibition or control prescribed by the Administrator.

and odor can be perceived at very low levels. On May 24, 2000, New York amended its Agriculture and Markets Law (L.2000, c. 35, § 2) to add section 192–g, which provides:

1. For the purposes of this section, "gasoline" shall mean any fuel sold for use in motor vehicles and motor vehicle engines, and commonly or commercially known or sold as gasoline.

2. No person shall import into, or sell, dispense or offer for sale any gasoline which contains methyl tertiary butyl ether.

3. Any person who violates the provisions of this section shall be liable for a civil penalty of not less than five hundred dollars nor more than ten thousand dollars.

New York also amended section 19–0301(3) of New York Environmental Conservation Law (L.2000, c. 35, § 2) to add a new subsection B, which states: "No provision of this subdivision shall be deemed to authorize the use of methyl tertiary butyl ether as an oxygenate in any motor fuel imported into, or sold or offered for sale in this State." The amendments are effective January 1, 2004 (L.2000, c. 35, § 3). The legislative history of the N.Y. MTBE Law establishes that its purpose is to protect New York's groundwater from contamination, and this is not seriously contested by plaintiff.

**The motion**

Plaintiff moves for summary judgment awarding it all relief sought in the complaint.

**2.** Conflict preemption is often characterized as a type of implied preemption. *See, e.g., Geier v. American Honda Motor Co., Inc.,* 529 U.S. 861, 884, 120 S.Ct. 1913, 146 L.Ed.2d

## APPLICABLE LAW

### Summary judgment

A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the Court, viewing the evidence in the light most favorable to the nonmovant, determines that the movant has satisfied this burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact requiring a trial. *See id.* If the nonmovant fails to carry this burden, summary judgment is appropriate. *See id.*

### Preemption, generally

The Supremacy Clause, U.S. CONST., Art. VI, cl. 2, invalidates state laws that "interfere with, or are contrary to" federal law. *Gibbons v. Ogden,* 22 U.S. 1, 211, 9 Wheat. 1, 6 L.Ed. 23 (1824). Within constitutional limits, Congress may preempt state authority by expressly stating its intent to do so. *See Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). In the absence of explicit statutory language, courts infer intent to preempt where Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for states to supplement federal law. *See id.; Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947).

Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law. This "conflict preemption"[2] arises

914 (2000). Here, the Court uses the term "implied preemption" to refer only to preemption inferred where Congress has legislated comprehensively to occupy an entire field

when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941) (quoted in *Hillsborough Co. v. Automated Med. Labs., Inc.,* 471 U.S. 707, 712–13, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985)).

**State police power**

■ Regulation and control of matters related to public health and safety are within the police powers of the states. *See Hillsborough,* 471 U.S. at 715, 105 S.Ct. 2371. "The abatement and prevention of water pollution is a matter of state concern, and legislation designed to regulate and control such pollution is within the scope of the state's police power." *City of Utica v. Water Pollution Control Bd.,* 5 N.Y.2d 164, 168, 182 N.Y.S.2d 584, 156 N.E.2d 301 (1959); *accord Matter of Suffolk County v. Water Power & Control Comm.,* 269 N.Y. 158, 164–65, 199 N.E. 41 (1935); *see generally Huron Portland Cement Co. v. City of Detroit,* 362 U.S. 440, 442, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960).

■ Courts must narrowly construe a federal law which is claimed to preempt an exercise of state police power. *See Cipol-*

lone *v. Liggett Group, Inc.,* 505 U.S. 504, 518, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Indeed, when Congress legislates in a field which the states have traditionally occupied, there is a "presumption that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause." *Hillsborough,* 471 U.S. at 715, 105 S.Ct. 2371; *accord Rice,* 331 U.S. at 230, 67 S.Ct. 1146. The presumption does not arise, however, when the state regulates in an area where there has been a history of significant federal presence. *See United States v. Locke,* 529 U.S. 89, 107, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000).

## DISCUSSION

**Express preemption by Congress**

CAA contains an express preemption provision in section 211(c)(4)(A):

> Except as otherwise provided ... no State (or political subdivision thereof) may prescribe or attempt to enforce, **for purposes of motor vehicle emission control,** any control or prohibition respecting any characteristic or component of a fuel or fuel additive in a motor vehicle or motor vehicle engine—
>
> (i) if the Administrator has found that no control or prohibition of the characteristic or component of a fuel or fuel additive under paragraph (1)[3] is

of regulation, leaving no room for States to supplement federal law. The Court uses the term "conflict preemption" to refer to preemption arising where state law actually conflicts with federal law.

**3.** Paragraph (1) of CAA § 211(c) provides:

The Administrator may, from time to time on the basis of information obtained under subsection (b) of this section or other information available to him, by regulation, control or prohibit the manufacture, introduction into commerce, offering for sale, or

sale of any fuel or fuel additive for use in a motor vehicle, motor vehicle engine, or nonroad engine or nonroad vehicle (A) if in the judgment of the Administrator any emission product of such fuel or fuel additive **causes, or contributes, to air pollution** which may reasonably be anticipated to endanger the public health or welfare, or (B) if emission products of such fuel or fuel additive **will impair to a significant degree the performance of any emission control device or system** which is in general use, or which the Administrator finds has been de-

necessary and has published his finding in the Federal Register, or

(ii) if the Administrator has prescribed under paragraph (1) a control or prohibition applicable to such characteristic or component of a fuel or fuel additive, unless State prohibition or control is identical to the prohibition or control prescribed by the Administrator. (Emphasis added.)

This prohibition of state regulation of fuels and fuel additives for purposes of motor vehicle emission control comports with Congress's comprehensive nationwide regulation of fuels and fuel additives for purposes of motor vehicle emission control in furtherance of the CAA's goal of protecting air resources and controlling air pollution. CAA § 101(b).

■ N.Y. MTBE Law, aimed at preventing groundwater pollution, is a public health measure clearly involving an exercise of New York's police powers. It is not a control or prohibition respecting any characteristic or component of a motor vehicle fuel or fuel additive for purposes of motor vehicle emission control. There is nothing in section 211 which expressly interferes with a state's exercise of police power in a field other than motor vehicle emissions, even where the state law affects a compound which is a fuel additive. Because section 211(c)(4)(A) expressly prohibits only state laws enacted "for purposes of motor vehicle emission control," it would require a broad reading of section 211 to find that its preemptive effect extends to state regulation for the purpose of protecting the state's groundwater. *See generally Pacific Gas and Elec. Co. v. State Energy Resources Conservation and Dev. Comm'n,* 461 U.S. 190, 209–10, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983) (federal

safety regulation of nuclear power, which authorized state regulation "for purposes other than protection against radiation hazards," did not preempt state regulation affecting nuclear power plants for economic purposes). Such a reading would be contrary to the general rule requiring narrow construction of a federal law which is claimed to preempt an exercise of state police power. *See Cipollone,* 505 U.S. at 518, 112 S.Ct. 2608. Accordingly, section 211(c)(4)(A) does not expressly preempt state action taken for the purpose of protecting the state's groundwater supply from contamination by MTBE.

## Express preemption by EPA

Plaintiff contends, however, that Congress delegated to EPA the authority to preempt the entire field of legislation affecting fuel and fuel additives for whatever purpose, and that, in carrying out its rulemaking authority, EPA did preempt the field. Plaintiff points to a portion of EPA's RFG rule implementing section 211(k), which reads:

Congress provided in the 1977 Amendments to...[CAA] that federal fuels regulations preempt non-identical State controls except under certain specified circumstances .... EPA believes that the same approach to federal preemption is desirable for the reformulated gasoline and anti-dumping programs. EPA, therefore, is issuing today's final rule under the authority of sections 211(k) and (c), and promulgate under section 211(c)(4) **that dissimilar State controls be preempted** unless either of the exemptions to federal preemption specified by section 211(c)(4) applies.

59 Fed.Reg. 7716, 7809 (Feb. 16, 1994).

■ Federal regulations have "no less preemptive effect than federal statutes."

---

veloped to a point where in a reasonable time it would be in general use were such

regulation to be promulgated.

*Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). The exercise of discretion of an agency administrator is subject to judicial review "only to determine whether he has exceeded his statutory authority or acted arbitrarily." *Id.* at 153–54, 102 S.Ct. 3014. When the administrator promulgates a preemptive regulation which "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, [a court] should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Id.* Thus, the question before this Court is not whether Congress expressly authorized EPA to displace state law, but rather whether doing so is reasonably within EPA's delegated powers.

■■■ Here, the EPA rule in question, quoted above, 59 Fed.Reg. 7716, 7809 (Feb. 16, 1994), expresses EPA's intent to preempt the entire field of legislation affecting fuel and fuel additives for whatever purpose. Sections 211(c) and (k), which EPA cites as authority for the rule, do not, however, support EPA's view that such a rule is reasonably within its powers. To the contrary, a thorough review of section 211 and its legislative history persuades the Court that the powers granted to EPA by the CAA amendments of 1990 pertaining to fuel regulation did not encompass the entire field of legislation affecting fuel and fuel additives for whatever purpose so as to sanction EPA's preemption of N.Y. MTBE Law.

Section 211(a) directs EPA to register fuels and fuel additives and prohibits the sale of unregistered fuels and fuel additives. Under section 211(c)(1), EPA, after considering all relevant medical and scientific evidence, may **control or prohibit the manufacture and sale** of any fuel or fuel additive if in its judgment "any emission product of such fuel or fuel additive causes, or contributes, to **air pollution** which may reasonably be anticipated to endanger the public health or welfare," provided that EPA finds that the prohibition "will not cause the use of any other fuel or fuel additive which will produce emissions which will endanger the public health or welfare to the same or greater degree than the use of the fuel or fuel additive proposed to be prohibited." CAA § 211(c)(2)(C) (emphasis added). No state may "prescribe or attempt to enforce, **for purposes of motor vehicle emission control,** any control or prohibition respecting any characteristic or component of a fuel or fuel additive." CAA § 211(c)(4) (emphasis added).

Specifically with respect to RFG, EPA is directed to establish those requirements for RFG which "shall require the **greatest reduction in emissions** of ozone forming volatile organic compounds (during the high ozone season) and **emissions** of toxic air pollutants (during the entire year) achievable through the reformulation of conventional gasoline, **taking into consideration the cost of achieving such emission reductions, any nonair-quality and other air-quality related health and environmental impacts and energy requirements.**" CAA § 211(k)(1) (emphasis added). EPA may **adjust or waive** other RFG requirements if compliance with them renders it **technically infeasible** to comply with limitations on oxides of nitrogen **emissions.** Section 211(k)(2)(A) (emphasis added). EPA may also waive, in whole or in part, application of the minimum oxygen requirement of RFG if it finds that compliance would "**prevent or interfere with** attainment by the area of a national primary ambient **air quality** standard." CAA § 211(k)(2)(B) (emphasis added). EPA may also **waive** the prohibi-

tion of heavy metals upon a finding that addition of heavy metals "will not increase, on an **aggregate mass or cancer-risk basis,** toxic air pollutant **emissions** from motor vehicles." Section 211(k)(2)(D) (emphasis added). Further, with respect to limitations on volatile organic compounds (VOC) and toxic **emissions,** EPA may **adjust** the limitation to provide for greater or lesser reductions based on **technological feasibility, considering the cost** of achieving such reductions[.] CAA § 211(k)(3)(B)(i), (ii) (emphasis added).

Areas beyond the original nine nonattainment areas covered by the statute may "opt in" to the RFG program. If EPA determines that there is insufficient domestic **capacity** to handle the increase in demand caused by opting-in, it may **extend** the effective date of the prohibitions in opt-in areas. CAA § 211(k)(6)(A), (B) (emphasis added). Section 211(k)(7) and (8) also contemplate "crediting" provisions permitting over-achieving refiners to pool, trade or sell their "excess" compliance.

Thus it is clear that Congress recognized that the goal of reducing harmful vehicle emissions could only be promoted in the larger context of market forces, health and environmental impacts, regional priorities, technological feasibility and other considerations. Essentially, EPA's role is to establish requirements and prohibitions applicable to the contents of RFG for the purpose of motor vehicle emission control, and to waive or adjust the requirements and prohibitions as needed to accommodate numerous factors such as cost, feasibility, supply and demand. Congress gave EPA the authority and flexibility to **respond** to those factors—not to **control** them—by shaping and reshaping the RFG program.

The legislative history of the 1990 amendment to CAA confirms this interpretation. For example, Senator Simpson, in

the Senate Debate of October 26, 1990, 1 CAA Leg. Hist., at 1170, stated that "EPA must not, in administering the oxygenated and reformulated gasoline programs, reinvent oil price and allocation controls like those administered by the Department of Energy in the 1970s. . . . New 211(k) . . . [is] in no way intended to resurrect a 1970s DOE-type scheme of detailed government intervention in U.S. gasoline markets." Representative Sharp, Chair of the Energy and Power subcommittee, in the House Debate of October 26, 1990, 1 CAA Leg. Hist., at 1209, stated:

> There were those who wanted to use these amendments and their new alternative fuels program to create a market niche for one new fuel or another. I think it is significant that Congress will not tilt the playing field. Reformulated diesel or gasoline, natural gas, methanol, electricity—maybe even fuels I can't name—all can play under this legislation if they meet the ambitious clean air goals we have set. Health, energy, financial and environmental benefits will determine which new fuels will be the fuels of the future.

Representative Sharp's view that the RFG program is predicated on the laws of supply and demand in a free marketplace is found repeatedly throughout the legislative history of the 1990 amendments. This view anticipates that the requirements of the RFG program and the characteristics of the fuels it regulates may change over time in response to numerous forces and factors, including "[h]ealth, energy, financial and environmental" factors. The legislation is not intended to maintain the *status quo* or to protect certain fuel additives. Nor does the legislative history suggest that Congress intended that EPA should have the power to compel a state to accept a fuel additive which the state perceives as a threat to public health on

grounds other than air quality. Rather, if a state rejects a fuel for purposes other than emission control, this rejection constitutes a factor which affects the market and which EPA must take into account in carrying out its responsibilities.[4] This reading is consistent with Congress' narrow express preemption clause in section 211(c)(4)(A), which prohibits states from prescribing or attempting to enforce **for purposes of motor vehicle emission control** any control or prohibition relative to motor vehicle fuels or fuel additives.

■■■ The Court also rejects plaintiff's argument that EPA has the authority to preempt legislation in the field of fuel additives in order to preserve uniformity of gasoline content throughout the nation. In fact, section 211 contemplates variations among the gasoline blends sold in different areas. First, only certain locales are subject to the RFG and oxygenated fuels programs. CAA § 211(k)(10)(D). Second, California is exempt from the federal programs, allowing it to enact its own fuel requirements. CAA §§ 110, 249(c)(2), 42 U.S.C. §§ 7410, 7589(c)(2). Third, section 211 prescribes variations in RFG and oxygenated gas according to region and season. CAA § 211(k)(3)(B)(i); (m)(2)(B). Fourth, various requirements of the RFG program may be waived or adjusted in certain circumstances. CAA

§ 211(k)(2)(B), (D); (3)(B)(i), (ii). Also, it is undisputed that ethanol is the oxygenate favored in the midwest and MTBE is favored in the northeast.

Accordingly, the court finds that plaintiff is not entitled to summary judgment on the ground of express preemption, either by statute or regulation.

### Implied preemption

■■■ Plaintiff also argues that congressional intent to occupy the entire field of legislation affecting fuel and fuel additives for whatever purpose, and thus to preempt state action in that field, may be implied from CAA. A court may imply congressional intent to preempt state law in a particular field where the scheme of federal regulation is "sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation." *Rice*, 331 U.S. at 230, 67 S.Ct. 1146 (internal quotation marks omitted). Where, however, Congress has addressed the issue of preemption by including in the legislation an express preemption clause which provides a "reliable *indicium* of congressional intent with respect to state authority," *Malone v. White Motor Corp.*, 435 U.S. 497, 505, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978), "there is no need to infer congressional intent to pre-empt state laws from the substantive provisions" of the legislation.[5] *California*

---

**4.** Indeed, preventing a state from banning an oxygenate which it believes threatens its groundwater appears more likely to defeat rather than advance the goal of Congress and EPA that oxygenated fuels "compete ... in the RFG market," 59 Fed.Reg. at 7720 (Feb. 16, 1994), by interfering with the operation of the forces of supply and demand. In other words, acceptance of plaintiff's position could have the effect of protecting the market share of MTBE even if it proves to be inferior to other oxygenates due to environmental considerations other than motor vehicle emissions.

**5.** To the extent that plaintiff argues that *Geier v. American Honda Motor Co.*, 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000), undermines this basic principle, the Court notes that *Geier* addresses conflict preemption. Certainly, the fact that a federal statute contains an express preemption clause does not preclude the possibility that a state law which is not covered by that express preemption clause may be subject to conflict preemption, that is, that it may stand as an obstacle to the accomplishment and execution of Congress' full purposes and objectives in enacting the statute. The existence of an express preemption clause does, however, bear on the ques-

*Fed. Sav. & Loan Assn. v. Guerra,* 479 U.S. 272, 282, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987); *accord Cipollone,* 505 U.S. at 517, 112 S.Ct. 2608.

Here, as discussed above, Congress has included a narrow express preemption provision in section 211(c)(4)(A) and has delegated to EPA powers consistent with the limits of that provision. Moreover, the express preemption clause, limited as it is to state action taken for the purpose of motor vehicle emission control, accords with the general scheme of CAA and its stated goal "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." CAA § 101(b)(1). There is no reason to doubt that the narrow express preemption provision in section 211(c)(4)(A) provides a "reliable *indicium* of congressional intent with respect to state authority," particularly in view of the Court's reading of the limited nature of the power delegated to EPA and the legislative history of the 1990 CAA amendments.

■ A related factor militating against a finding of implied preemption of a field which is so broad as to extend into the realm of groundwater protection is the general principle that a state's police powers are not to be superseded by federal legislation unless such was the "clear and manifest purpose of Congress." *Rice,* 331 U.S. at 230, 67 S.Ct. 1146. The burden of overcoming the presumption against preemption of state police power "is heavy in those cases that rely on implied preemption, which rests in turn on inference. Inference and implication will only rarely lead to the conclusion that it was the 'clear and manifest purpose' of the federal government to supersede the states' historic power to regulate health and safety." *En-*

*vironmental Encapsulating Corp. v. City of N.Y.,* 855 F.2d 48, 58 (2d Cir.1988). For the reasons stated above, the Court finds in CAA no clear and manifest purpose to preempt state action in the field of groundwater protection, where the action touches upon the field of motor vehicle fuel but is taken for a purpose other than motor vehicle emission control.

Accordingly, the court finds that plaintiff is not entitled to summary judgment on the ground of implied preemption.

**Conflict preemption**

■ Even where Congress has not expressly or impliedly preempted a field, a state law is invalid to the extent that it actually conflicts with federal law. Such a conflict arises when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime,* 373 U.S. at 142–43, 83 S.Ct. 1210, or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines,* 312 U.S. at 67, 61 S.Ct. 399 (quoted in *Hillsborough,* 471 U.S. at 712–13, 105 S.Ct. 2371). "[A]ny state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Gibbons,* 22 U.S. at 210–11, 9 Wheat. 1. "The relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail." *Free v. Bland,* 369 U.S. 663, 666, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962). Nor, in addressing conflict preemption, is it significant whether the state law and federal laws have similar or different purposes. *See Florida Lime,* 373 U.S. at 142, 83 S.Ct. 1210. It is well established, however, that conflict preemption is

tion of implied preemption, that is, whether in enacting a statute Congress implicitly intend-

ed to occupy fully a field larger than that covered by the express preemption clause.

ordinarily not to be implied absent an "actual conflict." *English v. General Elec. Co.*, 496 U.S. 72, 89–90, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). Supreme Court decisions "enjoin seeking out conflicts between state and federal regulation where none clearly exists." *Id.* (quoting *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 446, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960)).

In urging that conflict preemption exists, plaintiff does not contend that compliance with both CAA and N.Y. MTBE Law is impossible; obviously, compliance with both may be achieved through the use of oxygenates other than MTBE. Rather, plaintiff argues that N.Y. MTBE Law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Specifically, plaintiff argues that N.Y. MTBE Law "threatens the entire RFG program," because it will "unilaterally disrupt the efficient operation of a market that Congress sought to protect," thus frustrating congressional goals.

It is clear from a review of section 211(k) in light of CAA and the legislative history of the 1990 amendments to CAA that the congressional goal in enacting the RFG program was to reduce emissions pollution while ensuring an adequate gasoline supply at a reasonable cost, taking into account other health and environmental concerns so far as reasonable. CAA expressly provides that one of its purposes is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." CAA § 101(b)(1). Congress directs EPA, in carrying out the RFG program, to "require the greatest reduction in emissions ... achievable through the reformulation of conventional gasoline, taking into consideration the cost of achieving such emission reductions, any nonair-quality and

other air-quality related health and environmental impacts and energy requirements." CAA § 211(k)(1). As noted, section 211(k) permits EPA to adjust or waive specific RFG requirements based on considerations such as technical feasibility and cost, CAA § 211(k)(2)(A); (3)(B)(i), (ii), and, if appropriate in view of domestic capacity, to extend the effective date of the program in a region which has opted in to the RFG program. CAA § 211(k)(6)(A), (B).

 The parties dispute various characteristics of ethanol and whether these qualities make it more or less desirable as an oxygenate than MTBE. The parties also dispute the overall cost of substituting ethanol for MTBE, the volume of ethanol per year which would be needed to replace MTBE in the northeast, whether ethanol production capacity would be sufficient to meet the additional demand created by replacing MTBE with ethanol in the northeast and/or national market, and whether other oxygenates are or will be available. Many of the parties' assertions are based on studies and publications from such entities as EPA, United States Energy Information Administration, Northeast States for Coordinated Air Use Management, National Petroleum Council and California Energy Commission. For example, plaintiff states that if, as is likely due to distribution factors, N.Y. MTBE Law results in the use of ethanol throughout the entire northeastern United States, or if many states were to ban MTBE, an oxygenate demand would arise which far exceeds current capacity and which ethanol production capability would be unable to meet, citing a National Petroleum Council publication, *U.S. Petroleum Refining, Assuring the Adequacy and Affordability of Cleaner Fuel*, 14–15 (2000), and a California Energy Commission publication, *Supply and Cost of Alternatives to MTBE in Gasoline*, 16–18 (1999). Plaintiff also points to the California Energy Commission publication

and other studies for estimates of increased gasoline costs in the event of an MTBE ban. Defendants cite other sections of the California Energy Commission publication to support their position that the three-year phase-out of MTBE in the N.Y. MTBE Law "is thought to be sufficient to address supply problems and permit innovation in the oxygenate industry to bring additional production of other oxygenates to the market." Defendants also urge that the cost estimates relied on by plaintiff do not apply here because they assume an immediate ban on MTBE, not a gradual phase-out. Notably lacking from both parties is competent proof from qualified experts supporting the parties' factual assertions and predictions. The one expert affidavit submitted by plaintiff, that of John J. Kneiss, states essentially that it is not known whether MTBE is a carcinogen. On this record the Court is unable to determine whether N.Y. MTBE Law stands as an obstacle to the accomplishment and execution of the goals of the RFG program.[6]

Plaintiff further argues that N.Y. MTBE Law conflicts with congressional intent to grant EPA exclusive authority to certify fuels and to regulate certified fuels under section 211(f) and thus constitutes a *de facto* revocation of EPA's waiver into commerce of MTBE. Plaintiff urges that allowing revocations of waivers into commerce of fuels would "pose an ever-present threat to the marketing of new fuels, fostering great uncertainty in the business community." *American Methyl Corp. v. EPA*, 749 F.2d 826, 840 (D.C.Cir.1984) (holding that EPA must follow procedures prescribed in section 211(c) when seeking to revoke the waiver into commerce of fuels under section 211(f)(4)). N.Y. MTBE Law on its face is not a revocation of EPA's waiver into commerce of MTBE for the simple reason that New York's law prohibits the sale of MTBE only in New York. Plaintiff argues, however, that N.Y. MTBE Law will have the same undesirable effect as a revocation of waiver because it will impede the achievement of congressional goals by interfering with the legitimate expectations of fuel manufacturers and discouraging investment in technology to create more efficient, less costly, and less polluting substitutes for conventional fuels. *Id.* at 839–40. Again, on this record the Court is unable to assess the likelihood that N.Y. MTBE Law will have such an impact. Plaintiff has not demonstrated its entitlement to summary judgment on this issue.

Accordingly, it is hereby

ORDERED that plaintiff's motion for summary judgment is denied in its entirety.

IT IS SO ORDERED.

---

6. The Court does not agree with plaintiff that *Geier v. American Honda Motor Co.*, 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000), is "all but identical to the case before this Court." In *Geier*, the Court found that a rule of state tort law requiring all automobile manufacturers to install airbags stood as an obstacle to the accomplishment of objectives sought by a federal law which deliberately sought a variety of protection systems and a gradual phase-in of passive restraints, based on the policy judgment that safety would best be promoted if manufacturers installed alternative protection systems in their fleets rather than one particular system in every car. Thus, a state law requiring the use of one particular system in every car would frustrate Congress' purpose. Here, in contrast to the state law in *Geier*, N.Y. MTBE Law does not require New Yorkers to use only one particular product—rather, it prohibits only one product, MTBE, and the record does not establish as a matter of law that the availability of MTBE is essential to the achievement of Congress' objective in enacting the 1990 CAA amendments.