331 F.3d 665
 OXYGENATED FUELS ASSOCIATION INCORPORATED, Plaintiff-Appellant,
v.
Gray DAVIS, in his capacity as Governor of the State of California; Alan C. Lloyd, in his capacity as Chairman of the California Air Resources Board, Defendants-Appellees.
 No. 01-17078.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted February 11, 2003.
 Filed June 4, 2003.
 
 Frederick R. Anderson and Geraldine Edens, Cadwalader, Wickersham & Taft, Washington, DC, Rebecca Ceniceros and Gene Livingston, Livingston & Maattesich, Sacramento, CA, for appellant.
 Russell B. Hildreth, Office of the Attorney General, Sacramento, CA, Marc N. Melnick, Office of the Attorney General, Oakland, CA, for appellees.
 Appeal from the United States District Court for the Eastern District of California; David F. Levi, District Judge, Presiding. D.C. No. CV-01-00156-DFL.
 Before CANBY, O'SCANNLAIN and W. FLETCHER, Circuit Judges.
 OPINION
 WILLIAM A. FLETCHER, Circuit Judge.
 
 
 1
 Plaintiff-appellant Oxygenated Fuels Association Inc. ("OFA") sued various state officials after California enacted a ban on methyl tertiary-butyl ether ("MTBE"), an oxygenate used to reduce gasoline emissions. OFA, a trade association representing MTBE producers, argued that California's MTBE ban is preempted by the federal Clean Air Act, 42 U.S.C. § 7401 et seq., and sought to enjoin the ban. The defendants filed a motion to dismiss, which was granted by the district court.
 
 
 2
 We affirm. We conclude that, in enacting the Clean Air Act, Congress left the states substantial authority to enact legislation governing matters of public health and safety. Though the MTBE ban is not expressly exempted from preemption by the Clean Air Act, the ban nonetheless is not preempted because it does not conflict with the goals and purposes of the Act.
 
 I. Background
 
 3
 Congress enacted the Clean Air Act "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." Id. § 7401(b)(1). The Act includes a variety of provisions aimed at reducing air pollution. Implementation and enforcement responsibilities under the Act are shared between the federal government and state governments. For example, the EPA has the authority to set national ambient air quality standards, see id. § 7409, while the states have the authority to devise implementation plans to meet those standards, see id. § 7410.
 
 
 4
 One of the specific aims of the Clean Air Act is to reduce air pollution by reducing motor vehicle emissions. Section 211 of the Act, codified at 42 U.S.C. § 7545, sets forth the statutory framework for regulating motor vehicle fuels and fuel additives to achieve that aim. Among other things, § 211 requires that gasoline sold in certain areas of the country have an oxygen content that equals or exceeds 2.0 percent by weight. Id. § 7545(k)(2)(B). Section 211 further requires that, during the winter months, gasoline sold in certain areas have an oxygen content that equals or exceeds 2.7 percent by weight. Id. § 7545(m)(2)(B).
 
 
 5
 In order to meet the Clean Air Act's oxygen content requirements, gasoline manufacturers add oxygenate fuel additives to gasoline. MTBE and ethanol are the two most widely used oxygenates. California determined that, while MTBE reduces air pollution from motor vehicle emissions, it also causes substantial and deleterious groundwater pollution. In response to concerns about groundwater pollution, the California Air Resources Board decided to ban the use of MTBE as a fuel additive. See Cal.Code Regs. tit. 13, § 2262.6 (2003). The ban, adopted on December 9, 1999, was originally scheduled to take effect on December 31, 2002. The effective date has since been postponed for one year.
 
 
 6
 On May 4, 2001, OFA filed suit in the district court seeking to enjoin California's MTBE ban. OFA argued, among other things, that the ban conflicts with the objectives of the Clean Air Act and is therefore preempted. The defendants moved to dismiss the case under Rule 12(b)(6). Ruling that California is expressly exempted from Clean Air Act preemption, the district court granted the motion. Oxygenated Fuels Ass'n v. Davis, 163 F.Supp.2d 1182, 1186-87 (E.D.Cal.2001). The district court also held, in the alternative, that, even if not expressly exempted, California's MTBE ban is in any event not impliedly preempted by the Act. See id. at 1187-88. OFA appeals.
 
 
 7
 "We review de novo a dismissal under Fed.R.Civ.P. 12(b)(6) for failure to state a claim. In such a case, we must accept all factual allegations of the complaint as true and draw all reasonable inferences in favor of the nonmoving party." TwoRivers v. Lewis, 174 F.3d 987, 991 (9th Cir.1999) (citation omitted).
 
 II. Discussion
 A. Background
 
 8
 Under Article VI of the Constitution, laws of the federal government "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Art. VI, cl. 2. Congress has the authority, when acting pursuant to its enumerated powers, to preempt state and local laws. The Supreme Court has recognized three types of preemption: express preemption, field preemption, and conflict preemption:
 
 
 9
 First, Congress can define explicitly the extent to which its enactments pre-empt state law....
 
 
 10
 Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively....
 
 
 11
 Finally, state law is pre-empted to the extent that it actually conflicts with federal law. Thus, the Court has found pre-emption where it is impossible for a private party to comply with both state and federal requirements, or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."
 
 
 12
 English v. Gen. Elec. Co., 496 U.S. 72, 78-79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990) (quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)) (other citations omitted). Field preemption and conflict preemption are both forms of implied preemption. See Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 541, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001).
 
 
 13
 "Congressional purpose is the `ultimate touchstone' of preemption analysis." Id. (quoting Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)). Because it is assumed that Congress does not cavalierly decide to override state authority, there is a general presumption against preemption in areas traditionally regulated by states. "[W]e start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). Preemption analysis requires a close examination of the particular statutes and regulations at issue. "[E]ach case turns on the peculiarities and special features of the federal regulatory scheme in question." City of Burbank v. Lockheed Air Terminal, Inc., 411 U.S. 624, 638, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973).
 
 B. Express Exemption from Preemption
 
 14
 The defendants argue that California's MTBE ban is expressly exempted from preemption under the Clean Air Act. The Act contains both an express preemption provision regarding the regulation of oxygenate fuel additives and an express statutory exemption for California from the preemption provision. Generally, "no State (or political subdivision thereof) may prescribe or attempt to enforce, for purposes of motor vehicle emission control, any control or prohibition respecting any characteristic or component of a fuel or fuel additive in a motor vehicle or motor vehicle engine." 42 U.S.C. § 7545(c)(4)(A). California, however, "may at any time prescribe and enforce, for the purpose of motor vehicle emission control, a control or prohibition respecting any fuel or fuel additive." Id. § 7545(c)(4)(B) (the "(c)(4)(B) exemption") (emphasis added). The defendants argue that California's MTBE ban falls squarely within the (c)(4)(B) exemption. OFA argues that the MTBE ban is not exempted because it is not "for the purpose of motor vehicle emission control."
 
 
 15
 OFA claims that California did not adopt the MTBE ban to control motor vehicle emissions, or for any other reason related to air pollution. Rather, it adopted the ban to protect groundwater. The defendants do not really dispute this claim. They argue, however, that the ban fits within the (c)(4)(B) exemption because the ban is part of its overall "emissions control regulatory scheme" and that the scheme, as a whole, largely has the purpose of emissions control. The disagreement between the parties on this point thus turns to a substantial extent on whether the object of preemption analysis is (1) the MTBE ban itself, or (2) California's comprehensive emissions regulatory scheme of which the ban is just one part.
 
 
 16
 There is no obvious answer to this question, but the Supreme Court's approach in analogous cases offers some guidance. In Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983), the Supreme Court addressed California's moratorium on the construction of nuclear power plants. Energy companies had challenged the moratorium, arguing that it was preempted by the federal Atomic Energy Act ("AEA"). The AEA contained a preemption provision that preserved states' power "to regulate activities for purposes other than protection against radiation hazards." Id. at 210, 103 S.Ct. 1713 (quoting 42 U.S.C. § 2021(k)). The Supreme Court concluded that Congress had taken "complete control of the safety and `nuclear' aspects of energy generation," while leaving other aspects to states. Id. at 212, 103 S.Ct. 1713. Whether the moratorium was preempted — that is, whether it fell within the AEA's express preemption provision — depended on whether it had a "non-safety rationale." Id. at 213, 103 S.Ct. 1713. In answering this question, the Supreme Court did not analyze California's plant-building moratorium as part of a larger energy control regulation or as part of an overall approach to energy policy. Rather, it analyzed the moratorium as a stand-alone provision, and it ruled that the moratorium itself had a nonsafety rationale and was therefore not preempted.
 
 
 17
 In Department of Treasury v. Fabe, 508 U.S. 491, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993), the Supreme Court attempted to define the scope of a preemption exemption provision in federal bankruptcy law:
 
 
 18
 The federal priority statute accords first priority to the United States with respect to a bankrupt debtor's obligations. An Ohio statute confers only fifth priority upon claims of the United States in proceedings to liquidate an insolvent insurance company. The federal priority statute pre-empts the inconsistent Ohio law unless the latter is exempt from preemption.... In order to resolve this case, we must decide whether a state statute establishing the priority of creditors' claims in a proceeding to liquidate an insolvent insurance company is a law enacted "for the purpose of regulating the business of insurance" ....
 
 
 19
 Id. at 493, 113 S.Ct. 2202 (citations omitted). The Court held that Ohio's prioritizing of policyholders was "for the purpose of regulating the business of insurance," and so was not preempted, because the relationship between insurance companies and their policy holders was central to the business of insurance. See id. at 501, 113 S.Ct. 2202. On the other hand, Ohio's attempt to prioritize other creditors' claims was preempted, because those provisions were not central to regulating the business of insurance, and were instead "designed to further the interests of other creditors." Id. at 508, 113 S.Ct. 2202. As in PG&E, the Court did not analyze Ohio's bankruptcy priority rules as part of an overall approach to regulating insurance, but analyzed the rules themselves to see if, individually, they were for the purpose of regulating insurance. Indeed, the Court even analyzed different elements of the priority law separately, striking down one provision as preempted while allowing another.
 
 
 20
 The Supreme Court's approach in PG&E and Fabe suggests that the relevant object of our preemption analysis is the MTBE ban itself, not California's overall emissions regulatory scheme. If we must decide whether the ban itself was enacted "for the purpose of motor vehicle emission control," 42 U.S.C. § 7545(c)(4)(B), the obvious answer is that it was not. Despite the simplicity of this suggested analysis, we nevertheless regard the exemption issue as a fairly close question. When Congress exempted California from the express preemption, it clearly intended to allow California substantial latitude in regulating, and choosing among, fuel additives under the (c)(4)(B) exemption. Surely, when acting within the exemption to choose among different oxygenates, California can consider — indeed, can give substantial weight to — factors other than the effects of those oxygenates on air pollution. But in this case, OFA has alleged that California adopted the MTBE ban specifically and solely for the purpose of protecting ground and drinking water. We therefore conclude, on a motion to dismiss under Rule 12(b)(6), that the ban does not come within the (c)(4)(B) exemption from preemption.
 
 
 21
 We note that our ruling comports with the decisions of other federal courts that have considered this issue. See Oxygenated Fuels Ass'n v. Pataki, 158 F.Supp.2d 248, 254 (N.D.N.Y.2001) (holding that New York's MTBE law is "aimed at preventing groundwater pollution" and "is not a control or prohibition respecting any characteristic or component of a motor vehicle fuel or fuel additive for purposes of motor vehicle emission control"); In re MTBE Prod. Liab. Litig., 175 F.Supp.2d 593, 612 (S.D.N.Y.2001) (holding that state lawsuits about MTBE contamination "concern[ed] groundwater contamination" and were "not brought for purposes of regulating motor vehicle emissions control"). In concert with these rulings, we hold that California's MTBE ban was not enacted for the purpose of emission control and therefore is not expressly exempted from preemption under Section 211(c)(4)(B) of the Clean Air Act.
 
 C. Conflict Preemption
 
 22
 OFA does not argue that California's MTBE ban is expressly preempted by the Clean Air Act. The reason for this is simple: the language of the Section 211(c)(4)(A) express preemption provision parallels the language of the (c)(4)(B) exemption. Under the (c)(4)(A) preemption provision, other states may not enforce a fuel control provision for the purpose of emission control, but under the (c)(4)(B) exemption, California may. See 42 U.S.C. § 7545(c)(4)(A)-(B). The two provisions are precisely coextensive. Therefore, because California's MTBE ban does not fit within the (c)(4)(B) exemption provision, it also does not fit within the (c)(4)(A) provision and is not expressly preempted.
 
 
 23
 OFA does argue, however, that the ban is impliedly preempted because it conflicts with the goals of the Clean Air Act. "`[A]n express definition of the pre-emptive reach of a statute ... supports a reasonable inference ... that Congress did not intend to pre-empt other matters.'" Lorillard, 533 U.S. at 541, 121 S.Ct. 2404 (quoting Freightliner Corp. v. Myrick, 514 U.S. 280, 288, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995)). Our holding that California's MTBE ban is not expressly preempted under (c)(4)(A) nevertheless does not "entirely foreclose[ ] any possibility of implied preemption." Freightliner, 514 U.S. at 288, 115 S.Ct. 1483.
 
 
 24
 In support of its contention that California's MTBE ban is impliedly preempted, OFA offers two different but related arguments about how the ban "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines, 312 U.S. at 67, 61 S.Ct. 399. First, OFA argues that, in enacting the Clean Air Act, Congress intended to give gasoline producers an unrestricted choice among oxygenate fuel additives. Second, OFA argues that Congress meant to ensure an adequate and reasonably priced supply of oxygenated gasoline, and that California's MTBE ban will substantially disrupt the gasoline market and cause an increase in prices. We address these arguments in turn.
 
 1. Oxygenate Neutrality
 
 25
 According to OFA, California's MTBE ban conflicts with the Act because it interferes with the marketplace and limits the choices of gasoline producers. OFA argues that a principle of "oxygenate neutrality" inheres in the Clean Air Act and that Congress intended to leave the choice of gasoline additives to the marketplace and gasoline producers. We find OFA's argument unpersuasive.
 
 
 26
 The Clean Air Act generally seeks to preserve state authority. It declares "that air pollution prevention ... and air pollution control at its source is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3). It states that its goals are "to encourage and assist the development and operation of regional air pollution prevention and control programs," id. § 7401(b)(4), and "to encourage or otherwise promote reasonable Federal, State, and local governmental actions, consistent with the provisions of this chapter, for pollution prevention," id. § 7401(c). The Act's savings provision provides a substantial retention of State authority. See id. § 7416. Finally, the Act explicitly contemplates that California can, in some instances, place restrictions on fuel additives. See id. § 7545(c)(4)(B).
 
 
 27
 OFA cites legislative history suggesting that Congress did not want the federal government to interfere with refiners' choices of additives. We hesitate to examine the legislative history, for we find the text of the Act relatively clear. Further, even if we do look to the history cited by OFA, it is composed primarily of statements of individual legislators. In analyzing legislative history, committee reports are "the authoritative source for finding the Legislature's intent," and statements of individual legislators are given much less weight. Garcia v. United States, 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984). Finally, to the extent that we give weight to these statements, they evince nothing more than a congressional desire that the federal government and the EPA remain neutral among additives. There is no clear history indicating that Congress intended that the states remain neutral when they, for example, enact water pollution measures.
 
 
 28
 Indeed, we have already substantially rejected the argument made here by OFA. "The legislative history [of the Clean Air Act] suggests that fuel neutrality on the part of the [EPA] Administrator was a goal of the provisions but all the references to state authority support the determination that state authority to regulate oxygenate levels was not thereby limited." Exxon Mobil Corp. v. EPA, 217 F.3d 1246, 1253 (9th Cir.2000). In Exxon Mobil, we ruled on a challenge to Nevada's plan "to require a 3.5 percent minimum oxygen content for wintertime gasoline." Id. at 1248. As a practical matter, MTBE may not be blended in gasoline at a level greater than 2.7 percent. See Nevada State Implementation Plan Revision, Clark County, 64 Fed. Reg. 29,573, 29,575 n. 3 (June 2, 1999). Consequently, Nevada's plan effectively banned the use of MTBE during the winter months. Exxon Mobil sued, arguing that Nevada's plan violated the Act's purpose of ensuring oxygenate neutrality, and that the plan was therefore preempted.
 
 
 29
 We rejected Exxon Mobil's argument. We noted that the Senate had originally proposed a 3.1 percent oxygen requirement for certain areas, but later reduced the requirement to 2.7 percent to allow for the use of MTBE, see Exxon Mobil, 217 F.3d at 1251, with an explanation by some Senators, however, that the Act still allowed states to adopt a higher requirement, see id. at 1251-53. Our analysis in Exxon Mobil mirrored the EPA's own analysis: the EPA had also concluded that congressional sentiments on fuel neutrality "address[ed] limitations on EPA's, not states', authority to choose between oxygenates." Nevada State Implementation Plan Revision, Clark County, 64 Fed. Reg. at 29,575. See also id. at 29,576-79 (discussing preemption claims).
 
 
 30
 OFA also argues that the Supreme Court's ruling in Geier v. American Honda Motor Co., 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000), supports a holding that the Clean Air Act leaves the choice of oxygenates to gasoline producers. In Geier, the Supreme Court considered whether a lawsuit arising out of an automobile accident and premised on state tort law was preempted by the Department of Transportation's Federal Motor Vehicle Safety Standard ("FMVSS"). The lawsuit essentially sought to create, and then to rely on, a state common-law standard requiring airbags in all passenger cars. See id. at 865, 120 S.Ct. 1913. The Supreme Court held that such a state-law requirement was preempted by the FMVSS. According to the Court, the FMVSS "deliberately provided the manufacturer with a range of choices among different passive restraint devices." Id. at 875, 120 S.Ct. 1913.
 
 
 31
 Geier is distinguishable from this case on two grounds. First, in Geier, the relevant regulating agency, in interpreting its own governing statute, had decided that the suit was preempted, and the Supreme Court gave deference to the agency's determination. See id. at 883-84, 120 S.Ct. 1913. Here the EPA has made no such determination. Second, the Supreme Court in Geier found abundant evidence in the administrative history of the FMVSS to indicate that it was intended to give auto manufacturers a choice of safety restraints. See id. at 875-83, 120 S.Ct. 1913. We can find no evidence that the Clean Air Act was intended to give gasoline producers a comparable choice of oxygenates. Indeed, we have already specifically held in Exxon Mobil that the legislative history of the Clean Air Act does not support a conclusion that Congress meant to give gasoline producers an unconstrained choice of oxygenates. For these reasons, several courts have already rejected Geier-based preemption challenges to MTBE regulations. See Abundiz v. Explorer Pipeline Co., 2002 WL 1592604, 2002 U.S. Dist. LEXIS 13120 at *10-17 (N.D.Tex. July 17, 2002) (holding that Geier does not compel a finding that state MTBE regulations are preempted); In re MTBE Litig., 175 F.Supp.2d at 614-16 (same); Pataki, 158 F.Supp.2d at 260 n. 6 (same). But see Holton v. Chevron U.S.A., 2001 U.S. Dist. LEXIS 17599 at *10 (D.N.J. July 3, 2001) (contra).
 
 
 32
 We conclude that there is no conflict between the Clean Air Act and California's MTBE ban. Neither the text nor the legislative history of the Clean Air Act provides clear evidence that the ban conflicts with a congressional goal of oxygenate neutrality. There is some evidence that the EPA is required to be neutral, but there is none that the states must also be neutral.
 
 2. Market Disruption
 
 33
 OFA also argues that California's MTBE ban is preempted because it will disrupt the market for gasoline. OFA alleges in its complaint that gasoline producers will be unable to obtain sufficient supplies of other oxygenates, and that gasoline prices will rise as supplies shrink. On a motion to dismiss under Rule 12(b)(6), we accept as true OFA's factual allegations.
 
 
 34
 We have already accepted OFA's allegation that the MTBE ban was enacted for the purpose of protecting groundwater, not for the purpose of regulating motor vehicle emissions. In analyzing conflict preemption, however, we examine not only the purpose of the MTBE ban; we also examine its effects. "Whatever the purpose or purposes of the state law, preemption analysis cannot ignore the effect of the challenged state action on the pre-empted field." Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 107, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992). Thus, even though the Clean Air Act and the MTBE ban operate in different areas — one protects air and the other protects water — we must nonetheless decide whether the effects of the latter interfere with the goals of the former.
 
 
 35
 The central goal of the Clean Air Act is to reduce air pollution. See 42 U.S.C. § 7401(b). OFA does not argue that California's MTBE ban will inhibit federal efforts to fight air pollution. It argues, rather, that a smoothly functioning gasoline market and inexpensive gasoline are also goals of the Clean Air Act, and that the ban will disrupt that market and cause high prices. OFA has offered virtually no support for its assertion that the Clean Air Act's goals — for purposes of preemption analysis — are a smoothly functioning market and cheap gasoline. It is questionable whether a smoothly functioning market should be considered a "goal" of the Clean Air Act; the statutory text describing the purposes of the Act mentions no such goal. See id. We take it as true that Congress wanted to reduce pollution caused by motor vehicles, but at the same time did not want to harm the nation's economy by causing gasoline prices to rise substantially. But saying that Congress might not have wanted to cause a substantial increase in gasoline prices is not the same as saying that assuring inexpensive gasoline was a goal of the Act.
 
 
 36
 We are required to presume that Congress did not intend to preempt areas of law that fall within the traditional exercise of the police powers of the states. Rice, 331 U.S. at 230, 67 S.Ct. 1146. Environmental regulation is an area of traditional state control. See Exxon Mobil, 217 F.3d at 1255. Only where there is "clear evidence" that Congress meant to assert federal control should we find that state action is preempted. Geier, 529 U.S. at 885, 120 S.Ct. 1913. There is no such evidence here. We have already noted that the Clean Air Act's provisions regarding oxygenate fuel additives "maintain[ ] state authority to adopt and enforce the strongest standards to prevent air pollution." Exxon Mobil, 217 F.3d at 1253. Those provisions also preserve state authority to adopt and enforce measures to prevent water pollution, even if those measures may, to some degree, disrupt the gasoline market and cause higher prices. California's MTBE ban thus does not "frustrate[ ] the full effectiveness of federal law." Perez v. Campbell, 402 U.S. 637, 652, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971).
 
 
 37
 For the foregoing reasons, we conclude that while California's ban on MTBE is not specifically exempted from preemption by the Clean Air Act, it is nonetheless not preempted, either expressly or impliedly, by the Act.
 
 
 38
 AFFIRMED.